THIS OPINION IS A
PRECEDENT OF THE
TTAB

Mailed:
22 February 2007

UNITED STATES PATENT AND TRADEMARK OFFICE
————

Trademark Trial and Appeal Board
————

In re Royal BodyCare, Inc.
————

Serial No. 78976265
————

Mark D. Perdue of Storm, LLP for Royal BodyCare, Inc.

Sharon A. Meier, Trademark Examining Attorney, Law Office 112 (Angela Wilson, Managing Attorney).

————

Before Hohein, Bucher, and Drost, Administrative Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On May 31, 2002, Royal BodyCare, Inc. (applicant) applied to register the mark NANOCEUTICAL, in standard character form, on the Principal Register for goods ultimately identified as "dietary and nutritional supplements" in Class 5. The application (Serial No. 78976265) is a divisional application of the original application (Serial No. 78132525). Applicant has filed a

statement of use that alleged dates of use anywhere and in interstate commerce of August 31, 2004.[1]

The examining attorney has refused registration on the ground that "applicant has not submitted an acceptable specimen of use."  Brief at 3.  More specifically, the examining attorney maintains that:  "In the only specimen submitted by applicant, the proposed mark, NANOCEUTICAL, is embedded in the phrase RBC's NANOCEUTICAL.  NANOCEUTICAL is an incomplete mark because it is missing essential and integral matter that appears in the mark on the specimen."  Brief at 4.

Applicant "submits that Nanoceutical, as a coined term, stands apart from the house mark RBC notwithstanding their proximity on the specimen."  Brief at 5.  Applicant further argues (Reply Brief at 2) that:

> Prior cases recognize that use of an applied–for trademark in connection with a "house" mark (or tradename, or corporate initials) does not create an integrated mark.  RBC is nothing more than an adjunct modifier that further informs consumers of the source of the goods, but it is not inseparable from the applied-for mark.  Removal of this abbreviation from the mark does not change, detract from, or contribute to the distinctive character of Nanoceutical.

---

[1] On July 6, 2005, the original application was divided and the goods in Class 3, non-medicated skin care preparation, remain in the original application (Serial No. 78132525).

Applicant argues that RBC is a house mark and claims ownership of Registration No. 1,965,116 for the following mark for goods in Classes 3, 5, and 32.[2]



Applicant also submitted evidence that shows that it uses RBC, with and without the crown design. Applicant's declarant, Trevor Scofield, maintains that "[d]ue to the widespread use of the RBC house mark by RoyalBodycare, Inc. [sic] and the fact that it is fairly obviously the initials of the company, combined with many conversations with distributors and end-user customers who refer to Royal BodyCare as 'RBC,' I believe that consumers of our products see it as a 'house mark.'" Declaration at 2-3.

The specimen submitted by applicant shows the mark applied to the goods, where RBC's NANOCEUTICAL is displayed directly above applicant's product mark, SILVER 22.



---

[2] We note that USPTO records indicate that this registration was cancelled on January 6, 2007.

An enlarged, reverse image enhancement of this portion of the specimen of record is set out below.



Attached to the declarations were examples of how applicant uses the term RBC.  Some of these examples follow:





USPTO rules (37 CFR § 2.51(b)) require:

In an application under section 1(b) of the Act, the drawing of the mark must be a substantially exact representation of the mark as intended to be used on or in connection with the goods and/or services specified in the application, and once an amendment to allege use under § 2.76 or a statement of use under § 2.88 has been filed, the drawing of the mark must be

a substantially exact representation of the mark as used on or in connection with the goods and/or services.

TMEP § 807.12(d) (4th ed. April 2005) summarizes the requirements for the mark in the drawing as compared to the mark in the specimen.

In an application under §1 of the Trademark Act, the mark on the drawing must be a complete mark, as evidenced by the specimen. When the representation on a drawing does not constitute a complete mark, it is sometimes referred to as "mutilation." This term indicates that essential and integral subject matter is missing from the drawing. An incomplete mark may not be registered.

"'Mutilation' is a concept long recognized as a part of trademark registration case law." Institut National des Appellations D'Origine v. Vintners International Co., 958 F.2d 1574, 22 USPQ2d 1190, 1197 (Fed. Cir. 1992). The question of whether a mark is a mutilation "boils down to a judgment as to whether that designation for which registration is sought comprises a separate and distinct 'trademark' in and of itself." Id. See also In re 1175856 Ontario Ltd., 81 USPQ2d 1446, 1448 (TTAB 2006).

TMEP § 807.14(b) informs examining attorneys that:

[I]n an application under § 1 of the Trademark Act, the applicant has some latitude in selecting the mark it wants to register. The mere fact that two or more elements form a composite mark does not necessarily mean that those elements are inseparable for registration purposes. An applicant may apply to register any element of a composite mark used or intended to be used if that element presents, or will

present, a separate and distinct commercial impression apart from any other matter with which the mark is or will be used on the specimen.

"The courts in a proper case may recognize the right to registration of one part of an owner's mark consisting of two parts." In re Servel, Inc., 181 F.2d 192, 85 USPQ 257, 260 (CCPA 1950)(SERVEL functions as a mark apart from the term INKLINGS). Cases have frequently held that an applicant's use of its corporate name or house mark along with another trademark or trade name does not create a unitary mark. Textron Inc. v. Cardinal Engineering Corp., 164 USPQ 397, 399 (TTAB 1969) ("While the record does show that Textron's principal or house mark 'HOMELITE' appears on its chain saws as well as in all of its advertising literature, there is no statutory limitation on the number of trademarks that one may use on or in connection with a particular product to indicate origin"); In re Emco, Inc., 158 USPQ 622, 623 (TTAB 1968) ("It is concluded that the law and the record support applicant's position that 'RESPONSER' is registrable without addition of the surname 'MEYER'"); and In re Barry Wright Corp., 155 USPQ 671, 672 (TTAB 1967) ("[I]t is clear that the notation '8-48' stands out as a distinguishable element separate and apart from the statement 'ANOTHER 8-48 FROM MATHATRONICS'").

Indeed, in a recent case the board held that the term PSYCHO in the mark shown below created a separate and distinct commercial impression from the words BUBBALOU'S BODACIOUS BAR-B-Q and design even though the word overlapped the design. In re Big Pig, Inc., 81 USPQ2d 1436, 1440 (TTAB 2006):



We note that the marks in the present case are not joined in any physical way although the specimen does show that they are relatively close to each other. Even terms that are connected may still create separate commercial impressions. In re Raychem Corp., 12 USPQ2d 1399, 1400 (TTAB 1989) (Board held that the "fact that hyphens connect both the part number and the generic term to the mark does not, under the circumstances presented by this case, create a unitary expression such that 'TINEL-LOCK' has no significance by itself as a trademark"); In re Berg Electronics, Inc., 163 USPQ 487 (TTAB 1969) (GRIPLET

creates a separate commercial impression despite overlapping with house mark BERG); In re Dempster Brothers, Inc., 132 USPQ 300 (TTAB 1961) (Despite specimens showing the terms DEMPSTER DUMPMASTER sharing the same first and last letters, DUMPMASTER separately registrable).

"While proximity is a consideration, it is the overall commercial impression of the mark that is controlling." 1175856 Ontario, 81 USPQ2d at 1448. In this case, the terms RBC's and NANCOEUTICAL are separate, not connected. They do create two separate impressions much as the marks in the cases noted above (Textron, Emco, and Big Pig).

Furthermore, we do not find the fact that the term, RBC's, is in the possessive form results in a conclusion that the marks are unitary. For example, the term "From Mathatronics" did not result in a mutilation when applicant sought to register "8-48" apart from the additional language. Barry Wright, 155 USPQ at 672. Here, the house mark or trade name "RBC's" performs its function of identifying a line of products from applicant much as the surname Meyer identified a product sold under the trademark RESPONSER rather than a product identified by the unitary mark MEYER RESPONSER. Emco, 158 USPQ at 623.

The last point we address is the examining attorney's dispute with applicant's contention that the mark RBC is a

8

house mark. According to the examining attorney, brief at 6:

> [T]he registration referenced by the applicant … is not a house mark, but rather a trademark comprised of the wording RBC embedded in a design of a crown and listing specific goods in Classes 3, 5, and 32. See TMEP Section 1402.03(b) regarding house marks. The mark as depicted in the prior registration is not displayed on the specimen submitted in this case, but rather only the word portion of the mark. It is simply not enough to conclude that the letters RBC comprise a house mark from the fact that the letters "RBC obviously are the initials or an abbreviation of the corporate name of the applicant" and that consumers would view them as such… With respect to the Scofield Declaration and attachments filed on December 12, 2005, the evidence is insufficient to establish use of the letters RBC as a house mark. A majority of the evidence submitted by the applicant depicts the letters RBC as a trade name and does not show use of the letters RBC as a trademark. Furthermore, several of the attachments show use of the registered mark comprised of a design of crown with the letters RBC enclosed within the design. As noted above, U.S. Registration No. 1965116 is registered as a trademark not a house mark and the attachments submitted with the Scofield Declaration do not provide evidence otherwise.

Initially, we must disagree with the examining attorney's implication that a mark must be registered in the USPTO as a "house mark" before it can be considered as a house mark for purposes of determining whether the mark on the specimen is a mutilation of the mark in the drawing. As explained by Professor McCarthy, "under the rule of the Servel case, a house mark is registrable apart from the various product marks used on a label. Under the same

9

general principle, a product mark used in conjunction with a house mark is separately registrable if the product mark creates a separate commercial impression." 3 McCarthy on Trademarks and Unfair Competition § 19:59 (4th ed. 2006) The USPTO does permit the use of the term "house mark" in identifications of goods under certain circumstances. TMEP § 1402.03(b) (4th ed. April 2005):

> In an application to register a mark as a house mark based on use in commerce, the applicant must demonstrate that the mark is, in fact, used as a house mark. The examining attorney should require that the applicant provide catalogues showing broad use of the mark or similar evidence to substantiate this claim… If the applicant cannot do so, the applicant will be required to amend the identification of goods to conform to the usual standards for specificity.

However, the examining attorney has not pointed to any case, and we are unaware of any case, that required the house mark to be registered as a house mark in the USPTO in order to avoid a determination that the mark was a mutilation. The case law simply describes the mark as a house mark without indicating that it is registered as a house mark. See, e.g., In re Hacot-Colombier, 105 F.3d 616, 41 USPQ2d 1523, 1526 (Fed. Cir. 1997) ("Hacot-Colombier's proposed addition of its house mark remains a material alteration for two reasons"); and Textron, 164 USPQ at 399 ("[I]t is a common practice for manufacturers to apply both a house mark and a product mark to their

various merchandise"). See also Berg Electronics, 163 USPQ 488 (The "designation 'GRIPLET' as used on the label specimens creates a separate and distinct commercial impression apart from the house mark 'BERG'").

The board has explained what a house mark is as follows:

> It is well established that a product can bear more than one trademark, that each trademark may perform a different function for consumers and recipients of the product, and that each can be registered providing the mark as used, creates a separate and distinct impression in and of itself and serves to identify and distinguish the product as it is encountered by consumers in the normal marketing milieu for such goods… The usual situation in which this principle has normally been applied… involves a house mark which normally serves to identify the source of the product, per se, and a product mark which serves to identify a particular product within a line of merchandise normally associated with and distinguished by the house mark. That is, a house mark serves as an umbrella for all of the product marks and merchandise emanating from a single source.

Amica Mutual Insurance Company v. R. H. Cosmetics Corp., 204 USPQ 155, 161 (TTAB 1979). Thus, a mark could be considered a house mark if the evidence shows that it serves as a mark for a number of an entity's products even if the diversity of products would not be so great that the company would be able to use the term "house mark" in its identification of goods. See, e.g., In re Andes Candies Inc., 478 F.2d 1264, 178 USPQ 156, 156 (CCPA 1973) ("Appellant's mark [CRÈME DE MENTHE] is shown in large,

distinct type in a separate line on the boxes in which its laminated chocolate mint candies are packaged. Its trade name or house mark, ANDES, also appears prominently on its boxes").

Therefore, we conclude that the evidence shows that the term RBC is used as a house mark. We also find that, even if it were not, it is used in a way that is similar to the surname in the Emco case. Finally, the term NANOCEUTCIAL is used on the specimen in a manner that creates a commercial impression separate and apart from the house mark or trade name RBC's.

Decision: The refusal to register is reversed.